[Cite as *State v. Dugan*, 2023-Ohio-1157.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29255 |
| | : | |
| v. | : | Trial Court Case No. 2019 CR 03517/1 |
| | : | |
| DYLAN A. DUGAN | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 7, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

APRIL F. CAMPBELL, Attorney for Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Dylan A. Dugan appeals from his convictions for murder, aggravated robbery, and kidnapping following a jury trial in the Montgomery County Common Pleas Court. For the reasons that follow, we affirm the judgment of the trial court.

I.    Facts and Course of Proceedings

{¶ 2} On the evening of September 19, 2019, an armed robbery occurred on East Coach Drive at the apartment of Mitchel Maxwell Miller.   During the robbery, Miller, his girlfriend, and one of their friends were ordered to lie on the floor as four intruders gathered up items to steal.   As the robbery was concluding, one of the four intruders shot Miller in the shoulder.   Miller died later that night as a result of the gunshot wound.

{¶ 3} Dugan quickly became a suspect in Miller's murder.   On September 21, 2019, several police officers searched Dugan's residence pursuant to a search warrant; they found a handgun and items similar to ones that had been stolen from Miller's apartment during the armed robbery.

{¶ 4} On November 5, 2019, a Montgomery County grand jury indicted Dugan on six counts of murder, three counts of aggravated robbery, three counts of aggravated burglary, three counts of felonious assault, and three counts of kidnapping.   All 18 counts included three-year firearm specifications.

{¶ 5} Dugan filed a motion to suppress evidence obtained during the September 21, 2019 execution of the search warrant and search of his home.   After holding evidentiary hearings, the trial court overruled the motion to suppress.

{¶ 6} A jury trial was held in July 2021, at which the State presented the following evidence.

{¶ 7} Melissa Murray, a police and fire dispatcher with the Kettering Police Department, testified about the 911 call placed by Andrea Champ on September 19, 2019.   Although nobody spoke to her during the call, Murray was able to hear people

talking. She heard discussion about bleeding, a car, and a Speedway located at Andrew and Bigger. On cross-examination, she noted that she heard someone direct another person to say there had been a robbery at Speedway.

{¶ 8} Andrea Champ testified that, on the night of September 19, 2019, she was at her boyfriend's apartment. Her boyfriend was Max Miller. According to Champ, Miller was a drug dealer who mostly sold marijuana. There were cameras both inside and outside of the apartment but, on the night of the armed robbery, some of the inside cameras were not working due to a power outage earlier in the day. Miller, Champ, and a friend named Austin were in the apartment that night. According to Champ, an individual known on Snapchat as "King Kufo" came to Miller's apartment to purchase some marijuana. After he had been in the apartment for a few minutes, King Kufo opened the door to go outside; as he exited the apartment, four or five guys in masks burst through the door. Champ saw two guns in the hands of the intruders and threw herself to the floor. As the intruders were leaving, Champ heard "Don't be stupid" and then a gunshot. Miller then began screaming "I've been shot!" Champ saw that Miller was bleeding from his shoulder.

{¶ 9} Champ ran upstairs in the apartment complex trying to find help. Eventually, she found a man named Jake to help her and Austin load Miller into her car to take him to the hospital. Champ had considered calling 911 but decided against it. Unbeknownst to her, however, she had in fact called 911 on her phone. On the way to the hospital, Champ told Austin and Jake to tell the police that Miller had been mugged walking to Speedway. After they arrived at the hospital, Champ was interviewed by

Kettering Police Detective Vincent Mason. Initially, she lied to him about what had happened. However, she later told the full story when she found out that Miller had died at the hospital.

{¶ 10} J'Lynn Frank, Dugan's girlfriend and mother of their child, testified that she was pulled over by police on September 21, 2019. The night before, Dugan had threatened to shoot her. As she explained to the police officer who had interviewed her, Dugan told her that he had shot a person the other day and "he'd do it to [her], too." Frank testified that Dugan had come home on the night of September 19 with some stuff that he did not have previously. She also confirmed that Dugan owned a gun. Frank stated that she felt pressured to speak with the police.

{¶ 11} Jacob Florio was the man who had assisted Champ in taking Miller to the hospital on the night of the armed robbery. Miller was bleeding when Florio saw him that night. Florio previously had purchased marijuana from Miller.

{¶ 12} Adara Rushlow, a licensed optician who lived near Miller's apartment, testified that, on the night of the armed robbery, she saw three black men and one white man running through the parking lot. One of the men was holding a gold bowl. The white man who ran past her last was about 100 feet behind the other men and was holding a white trash bag. They all got into a dark gray or black Jeep Compass. She did not see any of them holding any guns.

{¶ 13} Kettering Police Officer Joshua Wolf testified that he was dispatched to Miami Valley Hospital South on the night of September 19, 2019. He met Florio, Austin, and Champ and put them into separate cruisers. Officer Wolf was told that Miller had

been shot at a Speedway.   He noted that Champ was crying and very upset and that she had glassy eyes and smelled of alcohol.

{¶ 14} Kettering Police Officer Matthew Stull testified that he originally was dispatched to an incorrect address on Coach Drive East, but a man there directed him to Miller's apartment.   The apartment manager was unable to open Miller's door with any of the available keys, so the police kicked in Miller's front door.   Once the door was forced open, Officer Stull immediately saw a shell casing on the floor.

{¶ 15} Dr. Mary Goolsby, a board-certified anatomic pathologist and forensic pathologist with the Montgomery County Coroner's Office, performed the autopsy on Miller.   She noted that there were bruises on his head, possibly from being beaten with a firearm, but the blows to the head were not fatal.   Dr. Goolsby also noted a gunshot wound to the right upper arm.   The bullet traveled through the right side of Miller's chest and ended up in Miller's pelvic region in the distal colon.   She testified that there had been a great amount of internal bleeding, and Miller died of blood loss caused by the gunshot wound.   There were no natural, contributing causes of death.

{¶ 16} Megan Senters, a pathology assistant with the Montgomery County Coroner's Office, was charge of collecting evidence.   Dr. Paul collected the bullet from Miller's body, and Senters then packaged the bullet.   She also collected Miller's fingerprints.

{¶ 17} Joyce Kaylor testified that, on the night of the armed robbery, she was living at the East Coach Drive apartments.   She saw a guy run from the apartments and then jump over the bushes.   He yelled to start the car and then left in an SUV.   She did not

see any others jump into the SUV. About 10-15 minutes later, other people left the area with a body.

{¶ 18} Kettering Police Detective Greg Stout conducted surveillance of the residence at 4710 Curundu, which is where Dugan and Frank lived. At the time of the surveillance, Dugan had been identified as a person of interest in Miller's death. Stout followed Frank when she left that location in a car. After several miles, another police officer pulled Frank over and questioned her about what she knew of the shooting that had occurred on September 19. According to Detective Stout, Frank seemed to be "legitimately fearful for her safety." Frank was interviewed for 45 minutes during the traffic stop and then was taken to the police station for further questioning. Police officers had her car towed to the police station. A subsequent search of Dugan's residence pursuant to a search warrant recovered, among other things, a firearm and a gold bowl.

{¶ 19} Kettering Patrol Sergeant Jesika Shriver-Kelch was dispatched to Miller's apartment on the night of the armed robbery. She testified that, when the door was forced open, she also saw the bullet casing on the floor. She started taking photos and collecting evidence along with Detective Marcum. The officers found a puddle of liquid in a parking spot at the apartment complex along with a receipt from a Shell service station. Sergeant Shriver-Kelch noted that some drug paraphernalia had been stolen from the ground outside Miller's apartment after the police arrived.

{¶ 20} Retired Kettering Police Detective David Marcum was an active detective for the Kettering Police Department at the time of the armed robbery in September 2019. Marcum testified that he had collected evidence from Miller's apartment pursuant to a

search warrant. Marcum recovered a .40 caliber handgun and a .22 revolver, along with vapes, candy THC, and edible cannabis. Subsequently, a search warrant was obtained for Dugan's residence, and Marcum was at Dugan's residence, along with several other police officers, when the search warrant was served on September 21, 2019. At that time, Dugan was ordered to walk backward toward the officers; Detective Marcum handcuffed him and asked Dugan if any guns were inside the residence. Dugan responded that he did not own any guns. Marcum testified that he had asked Dugan this question out of concern for the safety of the officers who would be searching the residence. Dugan asked Marcum why the police were there and what was going on. Marcum subsequently put Dugan in the back of a police cruiser.

{¶ 21} There were similarities between some of the possessions found at Dugan's residence and those found at Miller's apartment. The police also recovered a 9 mm Beretta, a mask, gloves, a gold bowl, and two white tennis shoes. Based on information received from federal records, the police investigated whether Dugan had purchased the gun from a pawn shop. Marcum noted that Dugan's house was fairly clean, and it appeared that a family lived there.

{¶ 22} Jordan Bertke, an employee of Rich's Pawn Shop, testified that Dugan had filled out a gun application in the pawn shop in July 2019; one day later, Rich's Pawn Shop sold him a 9 mm Beretta pistol. Bertke testified as to the serial number on the gun.

{¶ 23} Marcus Thomas Casey, a co-defendant with Dugan in the suspected murder of Miller, testified that he had entered into a plea deal with the State. On September 19, 2019, Casey was cleaning abandoned houses with Deverona Somerset.

They decided to smoke some marijuana together and began talking about robbing Miller. Casey previously had purchased marijuana from Miller under the Snapchat name of King Kufo. Casey and Somerset decided to involve Terance Bogan, Khanaei Head, and Dugan in the robbery. Dugan and Somerset had weapons. Dugan's gun had a clip with it.

{¶ 24} After the group arrived at Miller's apartment, Casey went into the apartment while the other four waited around the corner. When Casey exited the apartment, the other four rushed in with their masks on, while Casey went to the car and started it. Eventually, Somerset arrived at the car with a gold bowl. Then Bogan and Head arrived. After a pause, Dugan arrived last and was running. Casey saw Dugan putting his gun onto his hip. Casey had not heard any gunfire and did not know Dugan had shot anyone until Dugan said he had had to shoot him (Miller) because he was coming at him. When they reached Dugan's house, Casey took about $1,000 worth of the goods stolen from Miller's apartment. He testified that Dugan's residence was the last place he had seen the gold bowl that they had stolen from Miller's apartment.

{¶ 25} Casey initially denied his involvement in the robbery until he was shown evidence by the police. He conceded that the Shell receipt found by police was related to a stop Casey had made there. Casey stated that he did not have a valid ID, so he could not purchase a gun. According to Casey, Somerset involved Dugan in the robbery because they needed a gun.

{¶ 26} Kettering Police Detective Kevin McGuire testified to collecting DNA evidence from Dugan, and Kettering Police Officer Dennis Bower testified to taking two sets of Dugan's fingerprints.

{¶ 27} Bogan testified for the State and was also a co-defendant with Dugan relating to Miller's murder. He had previously met Somerset at a Job Corps program through which one could learn a trade. Bogan had lived at a homeless shelter for a few weeks until Somerset's mother allowed him to live with Somerset. Bogan had met Dugan at the Old Bag of Nails restaurant, where both of them worked. On September 19, 2019, Somerset arrived home accompanied by Casey, who Bogan had never met. Casey came up with the plan to rob Miller. They then decided to pick up Head and Dugan to assist in the robbery.

{¶ 28} According to Bogan, there were three guns brought to the robbery; Bogan, Dugan, and Head each took one into Miller's apartment. When Casey exited the apartment, Dugan entered first with his gun drawn. Bogan collected cartridges and vaping pens, but he dropped many of them on the ground as he was hurrying to exit the apartment. Dugan was the last of the five to get to the vehicle. Bogan did not hear any gunfire and did not know anyone had been shot until Dugan got to the car and told them that he had wrestled with Miller and shot him. According to Bogan, Dugan said "I shot him. I wanted to see what the gun was hitting for." Bogan interpreted that as meaning that Dugan wanted to test out the gun by shooting Miller. After the men arrived at Dugan's, they split up what they had stolen from Miller's apartment.

{¶ 29} On cross-examination, Bogan conceded that he initially told police that he had not had a gun during the robbery. He also reiterated that Somerset did not have a gun during the robbery. Bogan agreed that he was very close to Somerset. At the time of the robbery, Bogan had known Dugan for five or six months, and Bogan had been at

the pawn shop with Dugan when Dugan purchased his gun. The gun Bogan used at the robbery had been given to him by Dugan. Instead of giving it back to Dugan, he gave it to Somerset.

{¶ 30} Robin Ladd, a forensic scientist at the Bureau of Criminal Investigations ("BCI"), testified that she had reviewed fingerprints of Miller, Champ, Somerset, Casey, Head, and Dugan. Ultimately, she concluded that the fingerprints of Dugan and Casey were on the gold bowl that had been taken from Miller's apartment.

{¶ 31} Jerry Lanfear, a forensic scientist at BCI, testified that his fingerprint analysis revealed Dugan's palm print on the gold bowl.

{¶ 32} Matthew White, a firearm examiner at BCI, had test-fired five cartridges with Dugan's Beretta. He then compared the bullet retrieved from Miller's body with ones from Dugan's Beretta to determine whether the bullet from Miller's body had been fired by Dugan's gun. White concluded that the bullet found inside Miller had been fired from Dugan's gun.

{¶ 33} Sarah Grimsley, a forensic scientist at BCI, tested the gun and Dugan's tennis shoes for blood. *Id.* at 917-932. She concluded that Dugan's right tennis shoe contained four areas positive for blood. Grimsley then forwarded that blood for DNA testing.

{¶ 34} Devonie Herdeman, a forensic scientist at BCI, testified that he had found the DNA of Dugan and Miller on Dugan's firearm. Further, he had tested the tennis shoes; he found Dugan's DNA on the inside of the shoes and Miller's blood DNA on the outside of the right shoe.

{¶ 35} Kettering Police Detective Vincent Mason testified that he went to Miller's apartment after stopping at the hospital. He reviewed the available footage from Miller's cameras. He also reviewed the video from the Shell station. Mason noted that the serial number on Dugan's gun matched the serial number in the pawn shop's records relating to Dugan's gun purchase. Detective Mason testified that the outside Ring video at Miller's apartment showed one of the intruders wearing white shoes that resembled the white shoes found in Dugan's residence.

{¶ 36} On the day the police officers served the search warrant on Dugan, Detective Mason read Dugan his *Miranda* rights while Dugan was sitting in the back seat of a cruiser. Although he did not hear it at the time of his interaction with Dugan, Detective Mason acknowledged that an audio-recording from the police cruiser had picked up Dugan saying something like "I'm not talking to you" as Mason began reading the *Miranda* rights to Dugan. Mason also testified that Frank told the police that Dugan had said he had shot somebody last night and he would shoot her today. Frank also told them that Dugan had left his house on the night of September 19, 2019, with guys from the Old Bag of Nails restaurant. Finally, Mason testified that Somerset said he had dropped one of the guns from the robbery into the Little Miami River.

{¶ 37} The jury returned guilty verdicts against Dugan on all counts. After merging several of the counts, the trial court sentenced Dugan to a minimum of 30 years to life in prison to a maximum of 35.5 years to life. Dugan appeals from his convictions.

II. The Trial Court Did Not Err in Overruling Dugan's Motion to Suppress

**{¶ 38}** Dugan's first assignment of error states:

DUGAN'S CONVICTIONS SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS DUGAN'S STATEMENTS.

**{¶ 39}** When ruling on a motion to suppress, a trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." (Citation omitted.) *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). As a result, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 40}** Detectives Marcum and Mason testified at the hearing on the motion to suppress. Detective Marcum explained that he was sent to Dugan's address on September 21, 2019, to collect evidence and take photographs during the execution of a search warrant. Dugan exited the residence about five minutes after he was ordered to do so by loudspeaker. As Dugan was walking backward toward the police officers as directed, Dugan was saying "why are you here? Why are you here? I don't understand why you are here. What I'd do?" Motion to Suppress Tr. at 20. As Dugan was being handcuffed and searched, he again asked why the police were there and said he "didn't do anything." *Id.* After he was handcuffed, Detective Marcum asked Dugan if there were any guns in the house, to ensure officer safety before officers went into the house.

*Id.* at 21-22.   Dugan responded that there were no guns in the house, and that he didn't own a gun.   *Id.* at 22.   Detective Marcum then put Dugan in the back of a police cruiser and had no further contact with him.   *Id.* at 22-23, 30-31.

{¶ 41} Detective Mason met Dugan for the first time while Dugan was sitting in the back of the police cruiser.   Detective Mason explained that he first read Dugan his rights and told Dugan that he did not have to speak with him (Mason) if he didn't want to.   *Id.* at 43-44.   Detective Mason then testified that his first exchange with Dugan was about five minutes long; Dugan basically said that he did not know what Mason was talking about that the officers "shouldn't find anything in the house."   Mason then went inside to begin the search.   *Id.* at 44-45.   On cross-examination, Detective Mason stated that he did not hear Dugan say that he was not going to say anything to Detective Mason.   *Id.* at 60.   According to Detective Mason, "I read him his rights when I first opened the door and began talking to him[.]"   *Id.* at 61.

{¶ 42} Detective Mason provided additional testimony in a May 19, 2020 hearing on Dugan's motion to suppress.   *Id.* at 73-85.   Mason explained that he had listened again to the audio-recording from the police cruiser of his interaction with Dugan on September 21, 2019.   As a result, he issued a report stating that, while he had not originally heard Dugan say anything about not talking to him, he did hear Dugan say this in the audio-recording.   *Id.* at 76-79.

{¶ 43} The trial court overruled Dugan's motion to suppress statements that he made to police officers.   First, the trial court noted that Dugan had made voluntary statements to police officers as he exited the house and approached the officers.   The

trial court observed:

> When Defendant finally obeyed loudspeaker commands to exit the residence, Defendant made certain statements. Defendant made voluntary, spontaneous statements and asked questions, such as "why are you here?," "what did I do?," and "I didn't do anything." For purposes of officer safety incident to the execution of the search warrant, Detective Marcum asked Defendant, prior to police entering the residence, whether there were any guns inside the house. Defendant had not been Mirandized. Defendant stated, among other comments, that he did not own a gun and that no guns were in the house.

July 20, 2020 Decision, p. 1.

**{¶ 44}** Dugan also made statements to a police officer while he was detained in the back of the police cruiser. The trial court noted the following short verbal exchange between Detective Mason and Dugan that was captured by the police cruiser's recording system:

> Mason: Dylan?
>
> Defendant: Yes, sir.
>
> Mason: My name is Vince Mason, okay. I'm a detective with the City of Kettering Police Department. I don't want you to say anything, okay?
>
> Defendant: I'm not going to say anything to you.
>
> Mason: Before I say anything to you, I need to read you your rights, okay?

*Id.* at p. 2, quoting State's Exhibit 2 at Motion to Suppress Hearing.

{¶ 45} The trial court found the following with regard to Dugan's statements to Detective Mason while Dugan sat in the police cruiser:

> Detective Mason then administered Defendant a verbal Miranda advisement, telling Defendant the nature of the offenses under investigation. Defendant then immediately proceeds to respond to questions posed by Detective Mason. Under these facts in their totality, the court finds that Defendant did not make a clear and unambiguous invocation of his right to remain silent as to which law enforcement would be required to scrupulously honor. Defendant's statement was a direct, immediate response to Detective Mason's request for Defendant to remain silent so the Miranda advisement could be administered. Once the Miranda advisement was administered, Defendant made a knowing, voluntary, and intelligent waiver by responding cogently to questions. No force nor coercion was used. Defendant was treated courteously. Defendant did not appear to be compromised by drugs nor alcohol. No promises nor threats were exerted to prompt Defendant's waiver of rights. Hence, Defendant's statements made while he was inside the police cruiser are not subject to exclusion.

*Id.* p. 2.

{¶ 46} On appeal, Dugan only challenges the trial court's ruling insofar as it refused to suppress Dugan's statements to Detective Mason; he does not raise any issue with the statements made to Detective Marcum or the testimony provided by Detective Marcum

at trial. Therefore, we will only address whether the trial court erred in overruling the motion to suppress with regard to Dugan's statements to Detective Mason.

{¶ 47} "Once a suspect has received and understood the *Miranda* warnings, law enforcement officers may continue questioning 'until and unless the suspect clearly [invokes the right to remain silent].' " (Citations omitted.) *State v. Lawson*, 4th Dist. Pickaway No. 14CA20, 2015-Ohio-4394, ¶ 17. "If * * * the right to remain silent is invoked at any point during questioning, further interrogation must cease." (Citations omitted.) *Id.* "Invocation of the *Miranda* right to [remain silent] 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire [to cease all questioning].' " (Citations omitted.) *Id.* at ¶ 19. "If the suspect's statement is not an unambiguous or unequivocal [invocation of the right to remain silent], the officers have no obligation to stop questioning him." (Citation omitted.) *Id.*

{¶ 48} We have reviewed State's Exhibit 2, which includes the video recording of Detective Mason's interaction with Dugan in the back of the police cruiser. We agree with the trial court that Dugan's statement, "I'm not going to say anything to you," which was made in direct response to Detective Mason's request for Dugan to remain silent, was not a clear invocation of his right to remain silent; rather, it was an agreement with Mason's request that Dugan not speak until Mason had had a chance to read him his rights. The trial court found credible Detective Mason's testimony that, "on the scene he [Mason] did not hear [Dugan] say 'I'm not going to say anything to you.' " And it is not surprising on the record before us that Detective Mason did not hear Dugan's statement at the time it was made, because Detective Mason was in the middle of instructing him

not to speak before he read Dugan his rights. Further, after Detective Mason read Dugan his rights, Dugan voluntarily answered several questions asked of him. There was no clear invocation of his right to remain silent or a request to speak with an attorney, and there was no evidence that Dugan's will had been overcome in any way. Therefore, the trial court did not err in finding that Dugan's voluntary statements to Detective Mason were not subject to suppression.

{¶ 49} Dugan's first assignment of error is overruled.


III.     Dugan Has Failed to Establish Ineffective Assistance of Trial Counsel

{¶ 50} Dugan's second assignment of error states:

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR MISTRIAL ONCE IT WAS LEARNED THAT THE ENTIRE JURY WAS TAINTED WITH INADMISSIBLE PREJUDICIAL INFORMATION ABOUT THE CASE FROM THE NEWS PRIOR TO BEING EMPANELED.

{¶ 51} In the trial court, a prospective juror brought to the court's attention that some of the members of the prospective jury pool had conducted some research about the case before entering the courtroom. During voir dire of the prospective jurors, counsel for the State asked prospective juror Meske whether Meske could be a fair and impartial juror in this case. Meske then stated, "To be honest, several of us were reading up on cell phones before we came in here and I don't think I could be entirely unbiased towards this person." Trial Tr. p. 163. The trial court then conducted a sidebar with Meske and trial counsel. Meske explained that "several of us looked up the docket case

and were reading on it." *Id.* at 164. Meske had done a Google search about the case, which resulted in finding information about Dugan's having trespassed and punched someone in the head. *Id.* at 166-167. Meske explained the difficulty in being unbiased about the case based on the research he had conducted, along with Meske's personal, Christian beliefs. The trial court then released Meske from the prospective jury pool.

**{¶ 52}** The trial court then explained to the remainder of the jury pool that it was the court's standard practice to put up the "courtroom decorum orders" in front of the courtroom doors before a trial so that people know what they are supposed to do. The court further explained that there was a risk of people then looking up the case based on the information in the decorum order. The trial court asked whether any of the remaining prospective jurors had looked up any information on the case. Four individuals raised their hands. *Id.* at 170-171. The court explained the importance of jurors not having preconceived notions about judgment in the case. The judge pointed out that all of the prospective jurors had already been exposed to basic information of what the case was about during the voir dire that had been conducted to that point, such as what the counts were, who the alleged victims were, and a list of the witnesses. The trial court then spent a few extra minutes explaining the importance of being impartial and relying on the evidence presented in the courtroom, rather than anything heard outside the courtroom. *Id.* at 171-174. The trial court asked the prospective jurors if any of them thought they could not be impartial because of something they had been exposed to on the internet. No prospective jurors raised their hand. *Id.* at 173.

**{¶ 53}** Voir dire continued. As a result of further voir dire, it became clear that

prospective jurors Bowman and Vardel were two of the four jurors who had previously raised their hands in response to the question about who had conducted research or heard about the case. *Id.* at 171-174, 236-239. Neither of these two jurors were seated onto the 12-member jury or as the two alternates. That left two people who had heard about or conducted internet research relating to the case and who had raised their hands in response to the trial court's question. We are unable to determine through a review of the remaining record whether either of these two people was seated on the jury.

{¶ 54} Dugan contends that he received ineffective assistance of counsel, because his attorney did not move for mistrial "once it was learned that everyone in the panel heard inadmissible information about Dugan's case from the news." Appellant's Brief, p. 16. Although acknowledging that the trial court admonished the entire group of prospective jurors about Dugan's right to a fair and impartial jury and asked the prospective jurors whether they could follow the evidence despite what they had read on the internet, Dugan contends that the trial court's admonishment "did not cure the taint." *Id.* at 17.

{¶ 55} The State responds that a motion for mistrial would have been "untimely" prior to the jury's impanelment. Appellee's Brief, p. 15. Further, the State points out that only four people raised their hands when the prospective jurors were asked who had heard the information from a Google search of the case, and it is not clear from the record that any of the four was empaneled as a juror. The State contends that the curative instruction given by the trial court remedied any prejudicial detriment to Dugan and that counsel "employed sound trial strategy in permitting the court to question the venire." *Id.*

at 17.   Finally, the State argues that Dugan cannot show that any alleged error by trial counsel would have resulted in a different trial result, because the evidence of Dugan's guilt was overwhelming.   *Id.* at 17-18.

{¶ 56} To succeed on an ineffective assistance claim, a defendant must establish that: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him so as to deprive him of a fair trial.   *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.   To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation.   *Strickland* at 688; *Bradley* at 142.   To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."   *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus.   The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel.   *Strickland* at 697.

{¶ 57} In *Mitchell v. Leak*, 10th Dist. Franklin No. 92AP-1024, 1993 WL 86976 (March 18, 1993), the plaintiffs argued that the trial court had erred in failing to grant their motions for mistrial during voir dire of the prospective jury pool.   The plaintiffs contended that the entire prospective panel was tainted by the opinions expressed by one of the prospective jurors concerning medical malpractice cases.   *Id.* at * 1.   The Tenth District rejected this argument, concluding, in part:

The trial court did not err in refusing to grant plaintiffs' motions as the motions were untimely. A motion for a mistrial is untimely prior to the jury being impaneled. The correct method for correcting any irregularities prior to the jury being sworn is a motion to dismiss the entire jury panel. Plaintiffs in fact made such a motion which the trial court overruled. It is well-established that the determination of whether a prospective juror should be disqualified for bias is a discretionary function of the trial court.

*Id.*, citing *Berk v. Matthews*, 53 Ohio St.3d 161, 559 N.E.2d 1301 (1990).

{¶ 58} We do not believe a motion for a mistrial or a motion to dismiss the jury pool was warranted under the circumstances of this case. Contrary to Dugan's contention that the entire prospective jury pool was tainted, only four prospective jurors plus Meske indicated that they had conducted or heard any research about the case. Further, as the trial court noted, much information about the case had already been provided to the prospective jurors through the voir dire process. The trial court was meticulous in its explanation to the jury about the importance of relying only on the evidence presented in the courtroom. Further, we have reviewed the entire voir dire conducted by the trial court and trial counsel. The voir dire was robust and a constant theme throughout was the need to put any biases or personal experiences aside and rely on what was actually presented in the courtroom during the trial. Also, once the jury pool was impaneled, the trial court reminded the jurors before each break that they could not conduct any independent investigation of the case and could not have any contact with anyone who had heard media reports about the case.

{¶ 59} Based upon the record before us, we cannot conclude that Dugan's trial counsel was deficient when he failed to request a mistrial or the dismissal of the entire jury pool.   Further, given the overwhelming evidence that was presented of Dugan's guilt, we cannot conclude that there is a reasonable probability that, but for counsel's failure to request a mistrial or dismissal of the entire jury pool, the outcome of the trial would have been different.   Therefore, the second assignment of error is overruled.

IV.    The Trial Court Did Not Abuse Its Discretion in Allowing the State's Expert Witness to Testify When There Was A Factual Dispute Over Whether The State Provided Defense Counsel with the Expert's Report

{¶ 60} Dugan's third assignment of error states:

THE TRIAL COURT ERRED IN ALLOWING THE STATE'S EXPERT WITNESS TO TESTIFY DESPITE THE STATE'S FAILING TO COMPLY WITH CRIM.R. 16(K), WITH PREJUDICE TO DUGAN SUCH THAT IT WAS NOT HARMLESS.

{¶ 61} This assignment of error involves the trial testimony of Devonie Herdeman, a forensic scientist at BCI, and a December 17, 2019 expert report written by Herdeman. Dugan contends that the trial court should not have allowed Herdeman to testify at trial about the presence of Miller's blood DNA on Dugan's right shoe, because the State failed to provide Herdeman's expert report to Dugan's defense counsel within the time mandated by Crim.R. 16(K).   The State counters that the record shows that the expert report was provided to defense counsel well within the time period in Crim.R. 16(K).

Further, the State contends that even if we were to conclude that the trial court improperly permitted Herdeman's testimony, the error was harmless in light of the overwhelming evidence of Dugan's guilt. Appellee's Brief, p. 21.

{¶ 62} Crim.R. 16(K) provides:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 63} In *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, the Ohio Supreme Court stated that "[t]he plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: 'Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial.' " (Emphasis sic.) *Id.* at ¶ 55, quoting Crim.R. 16(K). Therefore, if the evidence before the trial court established that the State did not provide Dugan with a copy of Herdeman's expert report at least 21 days prior to trial, the trial court would have had no choice but to preclude Herdeman's testimony at trial.

{¶ 64} The following exchange occurred between trial counsel and the trial court when Dugan's trial counsel raised the issue of Herdeman's report:

THE COURT: Okay. We're in my office outside of the presence of our jury. Mr. Dugan is not present with us. Before we took our lunch recess, Mr. Wilder had voiced a concern on the record about a particular report.

* * *

MR. WILDER: Right. Judge, the - - I did ask about the report, and I did get handed the December 17th, 2019 report before lunch. I'm the third attorney - - second or third attorney on this case, and I picked up a huge file from Attorney Rezabek. There's a lot of flash drives, a lot of disks. There was even papers already printed.

I've been - - obviously, been through my discovery a lot, and this is a - - this report in and of itself puts the victim's blood on one of my client's shoes. This is something I have never seen, and this is probably something I wouldn't have overlooked. I've been through my discovery so many times.

I even contacted Mr. Rezabek and sent - - I actually sent him a photocopy of this and asked him, had you ever seen this, because I'm just now learning of it, or just becoming aware of it. He'd indicated he had never seen it either. So I'm going to ask, under Rule 16(K) that the specific opinions and expert testimony based off December 17, 2019 be excluded, because I've just - - it's not within the 21 days of me receiving it.

THE COURT: Okay. And what's the State's response to the

Defense request to exclude the report on the basis that it was not included and not previously turned over in discovery?

MS. DODD: Your Honor, I do keep - - because these cases are intensive paperwork wise, I do keep detailed notes of everything that's included in the reports that I provided to counsel. When Mr. Wilder came on the case, I provided - - at least in advance of trial, I provided him a packet of all the discovery letters, the detail, all the items provided to prior counsel, so that he would - - it was my understanding that Jeff Rezabek had really turned over his full file, so that Lucas could even go through and double check to make sure he had everything.

The December 17th, 2019 lab report by Devonie Herdeman was part of a discovery packed turned over May 1st, 2020, to Jeff Rezabek. It was signed for, and on a receipt. The receipt was filed July 13th, 2020, was signed for 7/7/20. That letter is part of the packet that was provided to Mr. Wilder with all of the discovery packets that were provided. Nothing attached has been - - the documents, just so you can inventory to make sure you have everything. And that packet of letters was signed for on June 30, 2021.

Trial Tr. p. 935-937.

{¶ 65} The Court noted the history of the two attorneys who represented Dugan prior to Attorney Wilder representing him at trial. Then the trial court concluded, "But with the State's documentation that the report had been turned over and notice of the

existence of the report had been provided to Mr. Wilder, I am going to allow the State to use that report." *Id.* at 938.

{¶ 66} The record contains a document filed on July 13, 2020, which references a May 1, 2020 Discovery Letter. Attorney Jeff Rezabek signed the document, acknowledging that he received the "Prosecutor's Information Packet, which includes Defendant's computerized criminal history, if available." There is no other detail contained in this filing about what was included in the "Prosecutor's Information Packet." At trial, the State represented to the trial court that the December 17, 2019 lab report by Herdeman was part of this discovery packed turned over May 1, 2020, to Jeff Rezabek. Similarly, the record contains a document filed on June 30, 2021, which references a June 28, 2021 Discovery Letter. Attorney Wilder signed the document, acknowledging that he had "received the Prosecutor's Information Packet, which includes Defendant's computerized criminal history, if available." There is no other detail contained in this filing about what was included in the "Prosecutor's Information Packet." At trial, the State represented that this June 28, 2021 Discovery Letter was a packet of letters that would have allowed Dugan's trial counsel to inventory whether he had everything that had been previously disclosed to prior defense counsel.

{¶ 67} Dugan contends that the State was required to go further. According to Dugan, the State failed to submit to the court the actual discovery letters that inventoried the discovery provided to Dugan's current and prior defense counsels. However, Dugan's trial counsel also failed to provide a copy of these discovery letters. Further, Dugan's counsel did not represent to the trial court that he did not receive a copy of all of

the State's discovery letters.

{¶ 68} We acknowledge that this was a difficult situation that occurred well into Dugan's trial. It would have been helpful to our review if either the State or the defense had submitted to the trial court an actual copy of the discovery letters that the State had provided to Dugan's former and current trial counsels. While it is clear from Crim.R. 16(K) that the burden was on the State to provide the expert report in a timely fashion, it is less clear what amount of evidence the State needed to provide to show that it met its burden. We are unable to find any controlling authority as to how much evidence the State must submit to prove that the expert report was in fact provided. In this case, the State's representations were supported in part by the July 13, 2020 and June 30, 2021 filings. Therefore, on the particular facts of this case, we cannot conclude that the trial court abused its discretion in allowing Herdeman to testify.

{¶ 69} Even if we had found that the trial court did abuse its discretion, however, we would not reverse Dugan's convictions. The Ohio Supreme Court has held that even if a reviewing court finds that the State did not comply with Civ.R. 16(K) and the expert's testimony should have been precluded at trial, the reviewing court must still conduct the harmless-error analysis established in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, in order to determine whether the error was reversible. *Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, at ¶ 60. In this regard, the Court stated, in part:

> First, it must be determined whether the defendant was prejudiced
> by the error, i.e., whether the error had an impact on the verdict. * * *

Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

*Boaston* at ¶ 63, quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 70} Herdeman's testimony addressed the identification of Miller's blood DNA on Dugan's right tennis shoe. There is no doubt that such evidence was material and prejudicial to Dugan. But if this prejudicial evidence were excised, the remaining, overwhelming evidence would nonetheless establish Dugan's guilt beyond a reasonable doubt. Dugan's own girlfriend testified that he had told her that he had shot someone around the time that Miller was shot. She also noted that Dugan had been on out the night of Miller's murder with friends from a restaurant where he and co-defendant Bogan worked and that he came back with some items that he did not have when he left. Two of the other individuals charged with robbing Miller on the night of September 19, 2019, testified that Dugan had admitted to shooting Miller. Expert and police testimony established that the bullet found inside Miller's body was shot from the gun found at Dugan's home, which Dugan had purchased earlier that year at a pawn shop. Dugan's DNA was found on the gold bowl that had been stolen from Miller's apartment. The white shoes found at Dugan's residence were consistent with the white shoes worn by one of the armed robbers, as captured on a video-camera outside Mitchell's apartment. Finally, many of the items found at Dugan's home were similar to the items that were missing

from Miller's apartment.

{¶ 71} Given the overwhelming amount of evidence that placed Dugan at the scene of the crime and identified him as the shooter, we conclude that any alleged error by the trial court in allowing Herdeman's expert testimony was harmless error. Dugan's third assignment of error is overruled.

V. The Trial Court Did Not Abuse Its Discretion by Allowing J'Lynn Frank to Testify About Dugan's Admission to Killing Someone

{¶ 72} Dugan's fourth assignment of error states:

THE TRIAL COURT SHOULD HAVE SUSTAINED DUGAN'S OBJECTIONS TO THE STATE'S QUESTIONING OF J'LYNN FRANK BECAUSE IT WAS IMPROPER: IT INADMISSIBLY PUT BEFORE THE JURY OUT-OF-COURT STATEMENTS OF THAT WITNESS WHICH INCULPATED DUGAN AND INTRODUCED OTHER ACTS.

{¶ 73} Dugan's contends that "the prosecution put before the jury unsworn inadmissible hearsay statements" from Dugan's girlfriend, J'Lynn Frank, which "both inculpated him in this shooting, and improperly brought before the jury unrelated threats to her." Appellant's Brief, p. 22. The State responds that, at trial, Dugan only objected to this testimony based on the leading nature of the question, and thus Dugan has waived all but plain error. Appellee's Brief, p. 23. Further, the State contends that the admission of any other acts testimony was proper for the limited purpose of proving the defendant's identity as the person who committed the offense. *Id.* at 25. According to

the State, Frank's testimony about Dugan's threat was not offered to prove that Dugan had a propensity to violence, but rather as an admission that he did in fact shoot someone on September 19, 2019. *Id.* at 27. Finally, the State notes that the statements Dugan made to Frank were not inadmissible hearsay; instead, the statements were admissions by a party opponent, which are excluded from hearsay. *Id.* at 28, citing Evid.R. 801(D)(2).

{¶ 74} In general, the admission or exclusion of relevant evidence is within the sound discretion of the trial court, and we review that decision for abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. The term "abuse of discretion" indicates an attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 75} Dugan contends that the following testimony by Frank should have been excluded from evidence:

Q: And do you remember telling [the police] what he said to you?

A: From the audio you played, yes.

Q: Okay. And what did you tell them?

A: In the audio, I said that he threatened to shoot me.

Q: And did he talk about shooting somebody else?

Mr. Wilder: Objection. Leading.

* * *

Q: Ms. Frank, you've reviewed the video?

A: Yeah, you showed me audio.

Q: Okay. And in that audio, do you recall telling the officer -- or did you tell the officer that what Dylan had said to you is that he shot someone the other day, and "He'd do it again to me, too"?

A: From the audio, yes.

Q: You told the officers that?

A: Yeah. In the audio, yes.

Q: Okay. Did you tell the officers that he had made that statement to you the day before when he left?

Mr. Wilder: Objection. Leading.

The Court: Overruled.

THE WITNESS: Yes.

Q: Do you remember -- trying to put this in sequence here. So there's the day he makes those statements to you that we just talked about, that "I shot somebody" the day -- I want to make sure I get it right. I don't want to mince words. That he, "shot someone the other day", (indiscernible) that, too. There's that day.

A: Okay.

Q: And is it the next day you get stopped by the police?

A: I believe so.

Trial Tr. p. 405-407.

{¶ 76} Although Dugan's trial counsel objected to Frank's testimony based on a leading question, he did not object based on the hearsay and other acts theories now

raised in Dugan's appellate brief. Accordingly, Dugan has waived all but plain error with respect to the trial court's decision to allow this testimony into evidence. Plain error arises only when, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 77} Under Evid.R. 801(C), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Statement" is defined as (1) an oral or written assertion or (2) nonverbal conduct of a person if that conduct is intended by that person as an assertion. Evid.R. 801(A). "An 'assertion' for hearsay purposes 'simply means to say that something is so,' e.g., that an event happened or that a condition existed." (Emphasis and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 97. Assertions can generally be proven true or false. *Id.*; *Rogers v. Olt*, 2018-Ohio-2110, 112 N.E.3d 407, ¶ 14 (2d Dist.). In general, hearsay is not admissible. Evid.R. 802. "Certain statements are excluded from the definition of hearsay, including statements of a party-opponent where the statement is offered against that party." *State v. Cole*, 2d Dist. Miami No. 2013-CA-18, 2014-Ohio-233, ¶ 36, citing Evid.R. 801(D)(2)(a).

{¶ 78} Dugan contends that the trial court should have excluded Frank's testimony as hearsay. We do not agree. Frank's testimony that Dugan told her he had shot someone the other day was a statement of a party opponent that was therefore excluded

from the definition of hearsay. As such, Dugan cannot show plain error in the trial court's decision to allow Frank's testimony about Dugan's statement.

{¶ 79} Dugan also contends that the trial court should have excluded Frank's testimony about Dugan's statement threatening to shoot her, because the statement was other acts evidence, "which directed the jury to convict based on his propensity for violence." Appellant's Brief, p. 24.

{¶ 80} Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." We agree with Dugan that Frank's testimony about Dugan's threat to shoot her could be evidence of an act to prove his character in order to show that Dugan had acted in accordance with this character on the night of the armed robbery. The State responds, however, that the statement made by Dugan was admissible into evidence pursuant to Evid.R. 404(B)(2) as showing identity. We do not agree.

{¶ 81} In *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994), the Ohio Supreme Court explained when other acts evidence could be properly admitted as evidence of identity:

> Other acts can be evidence of identity in two types of situations. First are those situations where other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment," and which are "inextricably related to the alleged criminal act." * * * For instance, if someone had seen [defendant]

trespassing on [the victim's] property on the evening of the attack, or had seen him speeding away from the crime scene, or had found him trying to remove evidence from the crime scene, or had seen him threatening a witness, such evidence could be admitted to prove identity. Such evidence would directly tie [defendant] to the crime at issue. The other acts the state seeks to introduce do not tie [defendant] to the immediate background of, nor are they inextricably related to, the murders. The other acts in this case are separate from the planning, carrying out, and aftermath of the crimes at issue.

Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)." * * * " 'Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense." * * * While we held [previously] that "the other acts need not be the same as or similar to the crime charged," * * * the acts should show a modus operandi identifiable with the defendant.

(Citations omitted.)

{¶ 82} We do not believe Dugan's "other act" of making a threat to shoot his girlfriend fit within the two situations identified by the Ohio Supreme Court in *Lowe* as

evidence of identity. However, as we noted above, Dugan waived all but plain error with regard to the admission of this other act evidence. Based on our review of all of the evidence submitted at trial, the overwhelming evidence established Dugan's guilt beyond a reasonable doubt, even if this other act evidence were removed from the equation. Therefore, we cannot conclude that this is one of the exceptional cases in which we should notice plain error in order to prevent a manifest miscarriage of justice.

{¶ 83} The fourth assignment of error is overruled.


VI.    Dugan Has Failed to Show Cumulative Error

{¶ 84} Dugan's Fifth Assignment of Error states:

DUGAN WAS DENIED HIS RIGHT TO A FAIR TRIAL IN THIS CASE BECAUSE OF CUMULATIVE ERROR.

{¶ 85} Under the cumulative error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). "However, in order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed in this case." *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000). "We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Mize*, 2022-Ohio-3163, 195 N.E.3d 574, ¶ 76 (2d Dist.),

quoting *State v. Durant*, 159 Ohio App.3d 208, 2004-Ohio-6224, 823 N.E.2d 506, ¶ 38 (2d Dist.).

**{¶ 86}** We have concluded that the trial court did not commit multiple errors. Therefore, the cumulative error doctrine does not apply.   The fifth assignment of error is overruled.


VII.    Conclusion

**{¶ 87}** Having overruled all of Dugan's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


EPLEY, J. and HUFFMAN, J., concur.